UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

D-1 OBIEL LUNA-SANTILLANES, D-2
ZIMIRI JIMENEZ, D-3 JOSE CHAVIRA-
VELAZQUEZ,

      Defendants.

_____/

Case No. 11-20492

Honorable Nancy G. Edmunds

**OPINION AND ORDER (1) GRANTING GOVERNMENT'S MOTION TO ALLOW
FINGERPRINTING [40]; AND (2) DENYING DEFENDANT LUNA-SANTILLANES'S
AND DEFENDANT JIMENEZ'S MOTIONS TO SUPPRESS [38, 39]**

On August 4, 2011, the grand jury returned an indictment against Defendants charging them with (1) a conspiracy to distribute heroin and cocaine, (2) possession with intent to distribute heroin, and (3) possession with intent to distribute cocaine.  This criminal matter comes before the Court on the following motions:

    (1) the government's motion to allow for fingerprinting [40];

    (2) Defendant Obiel Luna-Santillanes [D-1]'s motion to suppress evidence [38]; and

    (3) Defendant Zimiri Jimenez [D-2]'s motion to suppress evidence [39].

Because the government's motion to allow for fingerprinting is well-founded and for the reasons stated at the March 20, 2012 hearing, the government's motion is GRANTED with the understanding that the government will attempt to comply with D-1's request for the use of a pseudonym.  For the reasons stated more fully below, Defendants Luna-Santillanes's

and Jimenez's motions to suppress evidence based on the government's use of GPS tracking devises on a red Lincoln Aviator, a silver Chrysler Sebring, and a black Mazda are DENIED.

## I.    Background

On March 4, 2011, DEA task force officer (TFO) Todd Murray received information from a confidential source (CS) about "Seymour LNU," a person eventually identified (and referenced here) as Defendant Zimiri Jimenez (D-2). According to the CS, D-2 was using cell phone number 313-254-6219 (Phone-1) and driving a red Lincoln Aviator for drug deliveries. (Gov't Ex. 1.)

On March 11, 2011, the CS told TFO Murray that, according to D-2, the drugs were expected within a few days. (Gov't Ex. 2, ¶ 11.)

On March 15, 2011, TFO Murray obtained a search warrant for latitude/longitude location information for Phone-1 for a 30-day period. (Gov't Ex. 2.)

On March 22, 2011, before any GPS devices were placed on any cars at issue here, DEA TFOs conducted surveillance at a residence located on Stoner Street in River Rouge, Michigan – a location identified as being used by D-1 and members of his drug trafficking organization. (Gov't Exs. 3, 6.) The TFO's observed two vehicles at the River Rouge residence: (1) a red Lincoln Aviator registered to Donnita Cleveland of Highland Park, Michigan; and (2) a silver Chrysler Sebring without a license place that was registered to Santos Martinez-Guerrero of Detroit, Michigan. (Gov't Exs. 3 and 10.)

On March 23, 2011, the CS called Phone-1, spoke to D-1, and ordered a sample of heroin. (Gov't Ex. 4.) D-1 directed the CS to a parking lot in the area of Verner and I-75 in Detroit, Michigan and told the CS that his "associate" would deliver the sample. (*Id.*)

2

After doing as directed, the CS and an undercover TFO met with D-2, who arrived in a silver Sebring and gave the heroin sample to the CS.  The silver Chrysler Sebring that D-2 was driving is believed to be the same vehicle observed on March 22, 2011 at the River Rouge residence.  (Gov't Exs. 3, 4.)

On March 24, 2011, TFO Murray once again observed the red Lincoln Aviator and the silver Chrysler Sebring at the River Rouge residence.  (Gov't Ex. 3.)

On April 11, 2011, TFO Murray was conducting physical surveillance of D-1 while monitoring the location information on Phone-1.  During that surveillance, Phone-1 showed it was in the area of Vernon Street in Huntington Woods.  TFO Murray went to 11 Mile and Coolidge in Huntington Woods, Michigan and observed D-1 driving the red Lincoln Aviator going south on Coolidge and getting on eastbound I-696.  (Gov't Ex. 5.)

On April 13, 2011, DEA TFOs conducted physical surveillance of the River Rouge residence and observed the red Lincoln Aviator parked on the street.  The TFOs installed a GPS device on the red Lincoln Aviator, allowing them to monitor its movements.  (Gov't Ex. 6.)

Thus, before the installation of any GPS device on any of the three vehicles, officers had information from a CS that the River Rouge home was used by D-1 and members of his drug trafficking organization, had information that D-1 used a red Lincoln Aviator to deliver drugs, had physically observed D-1 driving the red Lincoln Aviator, had physically observed the red Lincoln Aviator and a silver Chrysler Sebring at the River Rouge home, had overheard the D-1 tell the CS where to go to obtain a heroin sample from his "associate," had physically observed the CS and an undercover officer obtain a heroin

3

sample from D-2 who arrived at the designated location driving a silver Chrysler Sebring that was previously observed by officers at the River Rouge home.

On April 13, 2011, after the GPS device had been installed on the red Lincoln Aviator, the CS called TFO Murray and told him that D-1 and two other people were supposed to pick up drugs the following day, April 14, 2011; that there would be two vehicles; that one vehicle likely would be the red Lincoln; and that D-1 would not be in the car with the drugs. (Gov't Ex. 7.)

On April 14, 2011, DEA TFOs used the GPS device on the red Lincoln Aviator and the location information from Phone-1 to monitor their movements.  It was determined that Phone-1 and the Lincoln had traveled to Chicago, and were now returning the same day to the Detroit area and traveling in close proximity of each other.  (Gov't Ex. 8.)  The DEA TFOs conducted physical surveillance on I-94 near Chelsea, Michigan and observed the red Lincoln Aviator occupied by one male headed eastbound.  They followed the Lincoln. TFO Murray requested assistance by the Michigan State Police to conduct a traffic stop, and the red Lincoln Aviator was stopped after a traffic violation had occurred.  (*Id.*)  The driver and sole occupant of the Lincoln was D-3 (the only Defendant who has not filed a motion to suppress).  D-3 consented to a search, and the police located over two kilograms of heroin in the red Lincoln Aviator.  D-3 was taken into custody.  (*Id.*, ¶¶ 6, 7.)

The location information provided by Phone-1[1] showed that it continued on to Romulus, Michigan.  (*Id.*, ¶ 8.)

---

[1]TFO Murray had obtained a search warrant for location information of a cellular phone used by D-1 on two additional occasions – April 25, 2011 and May 27, 2011.  (Gov't Exs. 19, 20.)

4

On May 1, 2011, TFO Murray received information from the CS that D-2 and D-3 were using a Hertz rental vehicle to conduct narcotics transactions. (Gov't Ex. 9.) The CS provided a license plate that, when queried, came back to a Mazda registered to Hertz Vehicles LLC. The CS also told TFO Murray that D-2 and D-3 would leave the Chrysler Sebring without any license plate parked at a Sterling Heights apartment complex and then take the Hertz rental car. (*Id.*)

On May 2, 2011, TFOs observed the silver Chrysler Sebring in a public parking lot at an apartment complex located at 14 Mile and Ryan in Sterling Heights and installed a GPS device on the Sebring. (Gov't Ex. 10.)

On May 8, 2011, TFOs observed a black Mazda at the Bristol Village Apartment complex in Sterling Heights, Michigan and installed a GPS tracker on that vehicle. (Gov't Ex. 11.)

On May 9, 2011, DEA TFOs conducted physical surveillance of a meeting with the CS, D-2, and D-3 in the parking lot of the Bristol Village Apartments in Sterling Heights, Michigan. The officers observed a black Mazda occupied by two Hispanic males drive into the apartment complex and then park in the street in front of an apartment building in that complex. They observed the two Hispanic males exit the vehicle. D-2 was identified as the driver, and D-3 was identified as the passenger. (Gov't Ex. 12.) The CS met with D-2 and D-3 near the street. After speaking for about 5 to 10 minutes, the CS shook hands with D-2 and D-3. D-2 and D-3 then walked across the street and got into a parked/unoccupied silver Sebring with no license plate. (*Id.*) D-2 and D-3 then left the apartment complex in the silver Sebring. The CS then entered the black Mazda, drove it to where the officers had

directed him, and showed the officer's where D-2 had placed the heroin sample in the Mazda.  The heroin field-tested positive for heroin.  (*Id.*)

On May 10, 2011, the CS called D-1, discussed the heroin sample, and asked what price he should charge.  (Gov't Ex. 13.)

On May 16, 2011, DEA TFOs conducted physical surveillance of the River Rouge home and D-1, D-2, and D-3.  They observed the Chrysler Sebring leave that residence with D-1 as the driver and D-2 as the passenger.  They observed the Sebring at Chase Bank on Verner in Detroit and observed D-3 get into the driver's seat and drive east on Verner to a Market on Vernon in Detroit, Michigan.  (Gov't Ex. 14.)  TFO Murray then observed D-2 walking east on Verner towards the La Fiesta Market and entering the Sebring.  The Sebring exited the parking lot with D-1, D-2, and D-3 in the Sebring.  (*Id.*)  Through electronic GPS monitoring, the Sebring was observed traveling from Verner in Detroit to the Oak Park, Michigan home of Oday Khalasawi.  The officers' continued surveillance was conducted both physically and with the aid of the GPS tracker on the Sebring.  (*Id.*)

On July 6, 2011, based on information from the CS that D-1 and D-2 had received a cocaine shipment, DEA TFOs conducted physical surveillance of the River Rouge residence.  (Gov't Exs. 15, 16.)  The officers physically observed D-3 digging a hole in the back yard with D-1 and D-2 watching.  They observed D-2 reach into the hole and retrieve a black brick-shaped object that he then took inside the residence.  Later, they observed D-2 come back outside and retrieve an unknown object in a black plastic bag out of the hole and back into the residence.  (Gov't Ex. 15.)

6

On July 7, 2011, TFO Murray obtained a search warrant for the River Rouge residence. (Gov't Ex. 16.) In his supporting affidavit, TFO Murray outlined the many facts of the investigation, including those described above. (*Id.*)

On July 8, 2011, DEA TFOs executed the search warrant at the River Rouge residence. D-1, D-2, and D-3 were the only three occupants of the residence at the time of the search. The officers found, in the home and buried in the backyard, multiple assault-style firearms and cell phones that contained pictures of these Defendants holding the firearms. (Gov't Ex. 17.)

On July 21, 2011, as part of an independent investigation, DEA Special Agent (SA) Edward Moore had received information from a different confidential source (CS-2).[2] CS-2 told SA Moore that Oday Khalasawi told CS-2 that he was selling kilogram-quantities of cocaine out of his home and wanted to know if CS-2 was interested in buying a kilogram from him. CS-2 and Khalasawi agreed that CS-2 would buy two kilograms of cocaine from him and would meet him at his Oak Park residence. (Gov't Ex. 18.) SA Moore and other officers conducted physical surveillance of the Oak Park residence and observed CS-2's vehicle park in the driveway and later depart. The officers also observed D-2 arrive at the Oak Park residence in a silver Town and Country minivan, exit the driver's seat, and enter the residence. Minutes later, they observed D-1 and D-3, along with Khalasawi and D-2, exit the front door of the Oak Park residence. D-2 got in the driver's side of the minivan and D-3 got in the passenger's seat. D-1 got in the driver's seat of a silver Sebring that

---

[2]SA Moore and TFO Murray are both within the DEA's Detroit Field Division but were in separate groups – SA Moore was in Group 14 and TFO Murray was in Group 8 – and were conducting separate investigations.

was parked near the residence and Khalasawi got in the passenger's seat of the Sebring. Both vehicles then left in tandem traveling first west on Leroy Street and then southbound on Wyoming Street.  An Oak Park scout car pulled over the silver Sebring on 8 Mile and Wyoming in Detroit and another Oak Park scout car pulled over the silver minivan at Northfolk and Wyoming in Detroit, Michigan.  (*Id.*)  In the minivan occupied by D-2 and D-3, officers found approximately two kilograms of cocaine.

## II.   Analysis

On August 4, 2011, a grand jury returned the indictment against all three Defendants. This matter is now before the Court on D-1's and D-2's motions to suppress evidence, and the government's motion to allow fingerprinting.   The Court first addresses the government's motion.

### A.  Government's Motion to Allow Fingerprinting

Because the government's motion to allow for fingerprinting is well-founded and for the reasons stated at the March 20, 2012 hearing, the government's motion is GRANTED with the understanding that the government will attempt to comply with D-1's request for the use of a pseudonym.

### B.  D-1's and D-2's Motions to Suppress

D-1 and D-2 argue that, because the government placed GPS devices on three vehicles – the red Lincoln Aviator, the silver Chrysler Sebring, and the rented Hertz black Mazda – that they "used," either as a driver or a passenger, without first obtaining a search warrant, all evidence seized as a result of information obtained from those three GPS devices violated their Fourth Amendments rights and thus should be suppressed. Specifically, D-1 seeks suppression of (1) all items seized during the execution of a search

warrant for the River Rouge residence on July 8, 2011, including items seized from the Chrysler Sebring parked in the back yard of that residence; (2) all information received from D-1's Cell Phone-1 (313-254-6219) and used in conjunction with the GPS device on the red Lincoln Aviator, although obtained via a March 15, 2011 search warrant; (3) all physical evidence seized from the red Lincoln Aviator driven by D-3 on April 14, 2011, including over two kilograms of heroin; and (4) all evidence, in any form, obtained by use of the GPS devices on the red Lincoln Aviator, the silver Chrysler Sebring, or the rented black Mazda. (D-1's Mot., Ex. 1 at 7-9.)  D-2 adopts D-1's arguments and further argues that, because it is impossible for the government to untangle the information gleaned from the unwarranted use of the three GPS devices and the actions taken by law enforcement in their investigation, all evidence seized after attachment of those devices, including the July 8, 2011 search of the River Rouge residence and the July 21, 2011 search of a silver Town and Country minivan driven by D-2, should be suppressed.

The government responds that Defendants' motions to suppress should be denied because (1) Defendants do not have a legitimate expectation of privacy in three vehicles at issue here – the red Lincoln Aviator, the silver Chrysler Sebring, and the rented black Mazda; (2) even if Defendants did have standing to challenge any search, i.e., monitoring of the movement of those vehicles, any search was reasonable under the Fourth Amendment; and (3) the evidence at issue here, including the kilograms of heroin found in the red Lincoln Aviator driven by D-3 and the kilograms of cocaine found in another vehicle that did not have a GPS device attached to it, would have inevitably been obtained by law enforcement independent of any monitoring of the three vehicles that did have GPS devices attached to them.

The Court begins its analysis by acknowledging the United States Supreme Court's recent decision in *United States v. Jones*, ___ U.S. ____, 132 S. Ct. 945, 948-49 (2012), holding that the government's attachment of a GPS device to a vehicle used exclusively by the defendant and registered to his wife, "and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search . . . within the meaning of the Fourth Amendment."   As a magistrate judge recently observed, "the point of disagreement with [Justice Alito's] concurring opinion in *Jones* was the re-emergence of a trespass theory for Fourth Amendment searches rather than application of existing reasonable expectation of privacy doctrine."  *United States v. Hanna*, No. 11-20678-CR, 2012 WL 279435, at *3 (S.D. Fla. Jan. 30, 2012).  Specifically, "five members of the Court concluded that Justice Scalia's trespass theory did not form a sufficiently comprehensive analysis of the Fourth Amendment implications of GPS monitoring and argued that GPS monitoring should also (in the case of Justice Sotomayor) or only (in the case of Justice Alito) be analyzed to determine whether it has invaded a reasonable expectation of privacy."  *Id.* at *4.

With *Jones* in mind, this Court now examines whether the searches and seizures that produced the evidence that Defendants now seek to suppress violated the Fourth Amendment.  At issue are:  (1) the April 14, 2011 automobile search consented to by D-3, the driver of the red Lincoln Aviator, and the resulting seizure of over two kilograms of heroin; (2) the July 8, 2011 search of the River Rouge residence, and the evidence seized from that residence; and (3) the July 21, 2011 search of a silver Town and Country minivan, and the resulting seizure of two kilograms of cocaine.  The Court addresses each in turn. Doing so, it rejects Defendants' argument that it is impossible to untangle the information

10

gleaned from the three GPS devices (searches) from the April 14, 201I, July 8, 2011, and July 21, 2011 searches and seizures that produced the evidence that D-1 and D-2 seek to suppress.

### A. April 14, 2011 Consented Search and Subsequent Seizure of Heroin

A defendant can object to a search only if he has standing. *See, e.g., United States v. Davis*, 430 F.3d 345, 359-60 (6th Cir. 2005). Moreover, the defendant "bears the burden of establishing Fourth Amendment standing." *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988). "[A] defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated;" and "[i]n cases involving Fourth Amendment violations, [courts] determine standing by deciding whether a defendant can establish a 'legitimate expectation' of privacy in the area searched or the items seized." *Davis*, 430 F.3d at 359-60 (citations omitted). In multi-defendant cases, each defendant's standing is analyzed independently. *See United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (observing that "[a] defendant's standing is determined independently from his co-defendant's standing with regard to the same items and places that are searched.") Moreover, in the context of an automobile search, the Sixth Circuit held that the defendant did not have standing to object to evidence obtained by law enforcement officers during the search of a car that he did not own and in which he was neither the driver nor a passenger. *See United States v. Elmore*, 304 F.3d 557, 558, 560-61 (6th Cir. 2002). *See also United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) (holding that the defendant passenger lacked standing to challenge the placement of a GPS tracking device on a vehicle that he "neither owned nor drove" but rather "was only an occasional passenger therein.").

11

Because neither D-1 nor D-2 have established that they owned or had a reasonable expectation of privacy in the red Lincoln Aviator that was occupied solely by D-3 on April 14, 2011, they lack standing to challenge the consented-to search that resulted in the seizure of over two kilograms of heroin and D-3's arrest that day. First, the red Lincoln Aviator was not registered to D-1 or D-2; and, unlike the defendant in *United States v. Jones*, 132 S. Ct. 945, 949 n.2 (2012), neither can establish that they were an "exclusive driver" of that Lincoln Aviator. Thus, unlike the defendant in *Jones*, D-1 and D-2 cannot persuasively argue that "[t]he Government usurped [their] property for the purpose of conducting surveillance on [them], thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection." *Jones*, 132 S. Ct. at 954 (Sotomayor, J., concurring).

This Court also rejects Defendants' argument that, because they sometimes used the Lincoln Aviator, they had a reasonable expectation of privacy in that vehicle at all times. That would be similar to the defendant in *Katz v. United States*, 389 U.S. 347 (1967), arguing that he had a reasonable expectation of privacy in someone else's wiretapped conversation in a public telephone booth simply because he sometimes used that public telephone booth, along with two other telephone booths. Defendants' argument turns the holding in *Katz* on its head. "What mattered, the [*Katz*] Court . . . held, was whether the conduct at issue 'violated the privacy upon which [the defendant] justifiably relied while using the telephone booth.'" *Jones*, 132 S. Ct. at 960 (Alito, J., concurring) (quoting *Katz*, 389 U.S. at 353). Applying *Katz* to the facts presented here, it is Defendants' reasonable expectation of privacy in their movements, not merely the movements of a vehicle they sometimes used, that triggers Fourth Amendment protections. Although D-1 was observed

12

using the red Lincoln Aviator on April 11, 2011, he was not using the vehicle when the GPS device was placed on it.  Rather, the TFOs installed the GPS device on that vehicle after they saw it unoccupied and parked on the street near the River Rouge residence that they were observing for reported drug activity.  More importantly, neither D-1 nor D-2 was driving the red Lincoln Aviator on April 14, 2011 when the traffic stop and search occurred that produced the kilograms of heroin that these Defendants seek to suppress.

Rather than ownership or exclusivity, the record evidence establishes that D-1 drove the red Lincoln Aviator one time – on April 11, 2011 – , a few days <u>before</u> the GPS device was attached.  It further establishes that the GPS device was installed on the red Lincoln Aviator only one day before the April 14, 2011 traffic stop, consented-to search, and seizure.  Moreover, as established by testimony at the March 20, 2012 hearing, the GPS device on the red Lincoln Aviator was removed within hours of the April 14, 2011 traffic stop.  Thus, even if Defendants could establish that they had standing to challenge the April 14, 2011 search and seizure of the red Lincoln Aviator, the one-day monitoring of that vehicle constituted a reasonable search.  As Justice Alito observed in his concurring opinion in *Jones*, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable."  *Id.* at 964.

For the above stated reasons, D-1's and D-2's motions to suppress the kilograms of heroin seized on April 14, 2011 are denied.[3]

---

[3]In light of the Court's decision, it is unnecessary to consider the government's additional arguments that (1) monitoring of all three vehicles was reasonable and thus did not violate the Fourth Amendment; and (2) independent of any use of the GPS device on the Lincoln Aviator, the officers inevitably would have discovered the kilograms of heroin

To the extent D-1 and D-2 argue that they have standing to challenge the placement of a GPS device on the red Lincoln Aviator, the silver Chrysler Sebring, or the rented black Mazda and the monitoring of their movements as an unreasonable search, this Court rejects those arguments.  Neither of these Defendants has presented evidence showing either an ownership or contractual interest in any of these vehicles or exclusivity of use such that would give rise to a legitimate expectation of privacy.[4]

### B.  July 8, 2011 Execution of Search Warrant at River Rouge Residence

D-1 and D-2 also seek to suppress all evidence seized as a result of the execution of a search warrant at the River Rouge residence on July 8, 2011.  They argue that, because it is impossible to untangle the information gleaned from the three GPS devices that supported that search warrant, all seized evidence is tainted and must be suppressed.  The government responds that, even if Defendants established that placing the GPS devices

---

in that vehicle because officers were monitoring the movements of Phone-1, made physical observations of the vehicle on the highway, had the license plate of the Lincoln Aviator thus allowing for physical monitoring, and relied on information from CS-1.

[4]At the March 20, 2012 hearing, these Defendants argued that, because the government placed a GPS device on every vehicle available to them, they had a legitimate expectation of privacy, not in the three vehicles at issue here but rather in the totality of their movements on the roadways over an extended period of time.  The Court rejects that argument for the following reasons.  First, *Jones* did not go this far, and Defendants cite no binding decision that does.  Second, the facts presented do not support Defendants' claim.  The testimony at the suppression hearing failed to establish that there was a GPS device on the silver Chrysler Town and Country minivan driven by D-2 during the July 21, 2011 traffic stop where the kilograms of cocaine were seized.  Moreover, rather than exclusivity of use, the evidence presented shows that Defendants 1, 2, and 3 used the three vehicles at issue here, and other vehicles, interchangeably.  In fact, there is evidence that a CS was allowed to drive the rented black Mazda.  (Gov't Ex. 12.)  Finally, as the testimony at the hearing established, although the GPS device was on the silver Sebring for about two months, a GPS device was on the red Lincoln Aviator for two days at the most and was on the rented black Mazda for only "a few days."

on the vehicles and subsequent monitoring of their movements constituted an unreasonable search, the evidence seized from the River Rouge residence search should not be suppressed because it would have inevitably been discovered by independent investigation – namely information from CS-1, monitoring of location information from cell Phone-1, and physical surveillance of that residence and Defendants' connections with that residence.  This Court agrees with the government.  Even if it were established that monitoring of the movements of the Lincoln Aviator, Chrysler Sebring, and rented black Mazda via the GPS devices attached to them constituted an unreasonable search, exceptions to the exclusionary rule apply, and the evidence seized as a result of the July 8, 2011 search should not be suppressed.

Defendants' motions to suppress are based on the exclusionary rule, and the government's opposing arguments are based on two exceptions to the exclusionary rule: the inevitable discovery and independent source doctrines.  The Court thus examines whether those exceptions apply here.

The Sixth Circuit recently discussed both exceptions.  The independent source doctrine "rests on the proper balance to be struck between the interests of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime." *United States v. Howard*, 621 F.3d 433, 451 (6th Cir. 2010) (internal quotation marks and citations omitted)*, cert. denied*, 131 S. Ct. 1623 (2011). "The exclusionary rule should put[ ] the police in the same, not a *worse*, position tha[n] they would have been in if no police error or misconduct had occurred." *Id*. (internal quotation marks and citations omitted).   "Accordingly, where challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position

than they would have been in absent any error or violation." *Id.* (internal quotation marks and citations omitted).

The inevitable discovery doctrine "is an extrapolation from the independent source doctrine." *Id.* (internal quotation marks and citation omitted). "As the Supreme Court has described the doctrine, '[*s*]*ince* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.'" *Id.* (quoting *Murray v. United States*, 487 U.S. 533, 539 (1988) (emphasis in original)). "In other words, "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). It is the government's burden to establish that any "tainted evidence would have been discovered by lawful means." *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) (internal quotation marks and citations omitted). The government satisfied its burden here.

The evidence presented to the Court shows that, before the installation of any GPS device on any of the three vehicles at issue here, law enforcement officers had information from a CS that the River Rouge home was used by D-1 and members of his drug trafficking organization, had information that D-1 used a red Lincoln Aviator to deliver drugs, had physically observed D-1 driving the red Lincoln Aviator, had physically observed the red Lincoln Aviator and silver Chrysler Sebring at the River Rouge home, had overhead D-1 tell the CS where to go to obtain a heroin sample from his "associate," had physically observed the CS and an undercover agent obtain a heroin sample from D-2 who arrived

16

at the designated location driving a silver Chrysler Sebring that was previously observed by officers at the River Rouge home.   Thus, before any monitoring information was obtained from any GPS, law enforcement officials had independent information (1) that the River Rouge residence was being used for drug trafficking, (2) tying D-1 to that River Rouge residence and drug trafficking, and (3) tying the red Lincoln Aviator and silver Chrysler Sebring to that residence and drug trafficking.

After GPS devices had been installed on the vehicles at issue here, law enforcement officers continued to obtain information from independent sources that D-1 and D-2 were engaged in drug trafficking activity at the River Rouge residence.   Specifically, on July 6, 2011, law enforcement officers received information from the CS that D-1 and D-2 had received a cocaine shipment.   Based on that information, DEA TFOs conducted physical surveillance of the River Rouge residence and physically observed D-3 digging a hole in the back yard with D-1 and D-2 watching.   They observed D-2 reach into the hole and retrieve a black brick-shaped object that he then took inside the residence.   Later, they observed D-2 come back outside and retrieve an unknown object in a black plastic bag out of the hole and take it back into the residence.   Officers were also monitoring location information from Defendants' cell phones (pursuant to search warrants).   On July 7, 2011, TFO Murray obtained a search warrant for the River Rouge residence using these and other facts and executed that search on July 8, 2011.   D-1, D-2, and D-3 were the only three occupants of the River Rouge residence at the time of the search.   Among the items seized by the officers, from the home and buried in the backyard, were multiple assault-style firearms and cell phones that contained pictures of these Defendants holding the firearms.

Ignoring the monitoring information obtained by the GPS devices, probable cause existed to search the River Rouge residence.  Because the evidence seized from that residence during the July 8, 2011 execution of the search warrant inevitably would have been discovered absent use of any GPS monitoring, Defendants' motions seeking to suppress this evidence are denied.  As set forth below, the same is true of the evidence seized on July 21, 2011.[5]

### C.  July 21, 2011 Search of Town & Country Minivan Driven by D-2

To the extent D-1 or D-2 argues for suppression of the kilograms of cocaine seized as the result of a traffic stop and search of a silver Town and Country minivan driven by D-2 on July 21, 2011, that argument also fails.  First, there was no GPS monitoring device on the Town and County minivan that D-2 was driving.  Moreover, even if the Court were to accept Defendants' arguments that there was an unreasonable search with regard to the GPS monitoring of the Lincoln, the Sebring, and the Mazda, the same two exceptions to the exclusionary rule discussed above – the inevitable discovery and independent source doctrines – apply here.

On July 21, 2011, as part of an independent investigation, DEA Special Agent (SA) Edward Moore had received information from a different confidential source (CS-2).  CS-2

---

[5]In light of the Court's decision, it is unnecessary to consider the government's additional argument that, because the use of a GPS device on a vehicle without first obtaining a search warrant was a widely-accepted practice in the police community that had not been held unconstitutional by the Sixth Circuit Court of Appeals, the *Leon* good faith exception to the exclusionary rule would apply.  If this Court were to consider this additional argument, it would find it persuasive.  As the United States Supreme Court recently held in *United States v. Davis*, ___ U.S. ___, 131 S. Ct. 2419, 2423-2424 (2011), "[b]ecause suppression would do nothing to deter police misconduct in these circumstances, . . . searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  *Id.* at 2423.

told SA Moore that Oday Khalasawi told CS-2 that he was selling kilogram-quantities of cocaine out of his Oak Park home and wanted to know if CS-2 was interested in buying a kilogram from him.  CS-2 and Khalasawi agreed that CS-2 would buy two kilograms of cocaine from him and would meet him at his Oak Park residence.  (Gov't Ex. 18.)  SA Moore and other officers conducted physical surveillance of the Oak Park residence and observed CS-2's vehicle park in the driveway and later depart.  The officers also observed D-2 arrive at the Oak Park residence in a silver Town and Country minivan, exit the driver's seat, and enter the residence.  Minutes later, they observed D-1 and D-3, along with Khalasawi and D-2, exit the front door of the Oak Park residence.  D-2 got in the driver's side of the minivan and D-3 got in the passenger's seat.  D-1 got in the driver's seat of a silver Sebring that was parked near the residence and Khalasawi got in the passenger's seat of the Sebring.  Both vehicles then left in tandem traveling first west on Leroy Street and then southbound on Wyoming Street.  An Oak Park scout car pulled over the silver Sebring on 8 Mile and Wyoming in Detroit and another Oak Park scout car pulled over the silver minivan at Northfolk and Wyoming in Detroit, Michigan.  (*Id.*)  In the minivan occupied by D-2 and D-3, officers found approximately two kilograms of cocaine.

The above evidence establishes that the kilograms of cocaine seized from that Town and Country minivan during the July 21, 2011 traffic stop and search inevitably would have been discovered absent use of any GPS monitoring on the three vehicles with devices. According, Defendants' motions to suppress this evidence are denied.

**III.  Conclusion**

19

For the above stated reasons, the government's motion to allow fingerprinting [40] is GRANTED; and Defendants Luna-Santillanes's and Zimiri Jimenez's motions to suppress evidence [38, 39] are DENIED.


SO ORDERED.

                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  March 26, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 26, 2012, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer
                    Case Manager